**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------x
In re:

Frontier Insurance Group, Inc. and
Frontier Insurance Group, LLC,                                    Chapter 11
                                                                 Case No. 05-36877 (CGM)

                            *Debtor/Reorganized Debtor.*
------------------------------------------------------------x
Benjamin Lawski, Superintendent of Financial
Services of the State of New York, as Liquidator of
Frontier Insurance Company,

                            *Plaintiff,*

            v.                                                   Adv. Pro. No. 14-9022 (RDD)

Frontier Insurance Group, LLC, and
County of Sullivan Industrial Development
Authority,

                            *Defendants.*
------------------------------------------------------------x

APPEARANCES:

Counsel:    Costigan Law PLLC, by William F. Costigan, Esq. and Otterbourg, P.C., by
            Melanie L. Cyganowski, Esq. for Plaintiff

            Allegaert Berger & Vogel, LLP, by Robert E. Malchman, Esq. for Reorganized
            Debtor/Defendant


            **MEMORANDUM OF DECISION AFTER TRIAL**

Hon. Robert D. Drain, United States Bankruptcy Judge

            This is a dispute between plaintiff Benjamin Lawski, as Superintendent of

Financial Services of the State of New York (the "Liquidator"),[1] as the statutory liquidator of

Frontier Insurance Company ("FIC"), on the one hand, and Frontier Insurance Group, LLC, the

---

[1] Mr. Lawski was succeeded by Maria T. Vullo as Superintendent of Financial Services of the State of New York.
Liquidator's Proposed Findings of Fact and Conclusions of Law ¶ 1.

1

reorganized debtor/defendant herein ("FIGL"), on the other, over title to the reversionary interest

from defendant County of Sullivan Industrial Development Authority (the "IDA")[2] in land and

improvements thereon in Sullivan County, New York that the parties have labeled in this

litigation "Parcels B and C."

FIGL is the successor to Frontier Insurance Group, Inc. ("FIGI") under FIGI's chapter 11

plan (the "Plan"), which was confirmed on December 2, 2005 and became effective on

September 20, 2007.[3]  FIGI was the corporate parent of FIC, an insurance company, among other

subsidiaries.  Both had their headquarters on land (the "Rock Hill Property") with an address at

195 Lake Louise Murray Rd., Rock Hill, New York that included the 2.7 acres and

improvements comprising Parcel B and the 12.967 acres and improvements comprising Parcel C,

as well as approximately 15.23 acres that included FIGI and FIC's headquarters building and the

parking lot immediately adjacent to it that the parties have referred to here as "Parcel A."  None

of the buildings apparently had an address in addition to the Rock Hill Property address.

It is worth emphasizing at the outset that the parties' present Parcel A, B and C

designations were not used when the events giving rise to this dispute occurred, including during

FIGI's chapter 11 case.  Rather, the parties and their predecessors referred to buildings -- the

headquarters building, which sits on Parcel A; a daycare center, referred to as "Nana's House,"

and a tool shed or "pole barn," which sit on Parcel C -- and, at times, the parking lots adjacent to

those structures, including the parking lot on Parcel B that is adjacent to Nana's House (and

could supplement the parking lot adjacent to the headquarters building) and the parking lot on

Parcel A that is adjacent to the headquarters building.

---

[2] As discussed below, since February 2014 the IDA lacked an interest in the real property at issue. It therefore has no
stake in this proceeding with the exception of needing to know whether it should deliver title to Parcels B and C to
the Liquidator or to FIGL, and it has neither answered nor otherwise appeared.
[3] The Plan is found at FIGL Trial Ex. D.

The Supreme Court of the State of New York placed FIC in a temporary rehabilitation proceeding under the New York Insurance Law on August 27, 2001, and entered a final rehabilitation order on October 10, 2001. That order appointed the New York Superintendent of Insurance (the "Rehabilitator" or the "Insurance Bureau"), who is the statutory predecessor of the Liquidator,[4] to take possession of FIC's property, conduct FIC's business, and take such steps as reasonably necessary to remove the causes and conditions which made the rehabilitation proceeding necessary.[5] For several years, the Rehabilitator administered FIC in the hope that it could be rehabilitated, satisfy its obligations and resume business without further supervision.

While FIC's rehabilitation process was ongoing, a third-party that was also engaged in the insurance business, Insurance Management Group, Inc. ("IMG") bought the debt secured by a first lien on substantially all of FIGI's assets, and FIGI commenced its chapter 11 case on June 5, 2005 with the goal of enabling IMG to obtain FIGI's interest in FIC, along with other property of FIGI, and working with the Rehabilitator to facilitate FIC's rehabilitation under the ultimate control of IMG.[6]

Confirmation of the Plan achieved the first step of that goal, through the transfer of FIGI's assets (with the exception of certain specifically excluded property that under the Plan went to pay administrative claims or to a creditor trust), including FIGI's shares in FIC, to FIGL, which in turn was owned by IMG.

In the end, however, FIC was not rehabilitated. Instead, on November 9, 2012, almost seven years after confirmation of the Plan, the Albany County Supreme Court converted FIC's rehabilitation proceeding to a liquidation proceeding, vesting the Liquidator with "title to all of

---

[4] Direct Testimony of Scott D. Fisher, ¶¶ 45-46 [Dkt. 55].
[5] Liquidator's Trial Ex. 23.
[6] Direct Testimony of John A. Petrilli, ¶¶ 3-5 [Dkt. 48].

[FIC's] property, contracts and rights of action" and directing him to liquidate [FIC's] business

and affairs in accordance with" the New York Insurance Law.  In the Matter of the Liquidation

of Frontier Insurance Co., Index No. 97/06 (Sup. Ct. Albany Cty., Nov. 9 2012).[7]

As discussed below, until this event the Rehabilitator and FIGI/FIGL appear to have

agreed on who owned the reversionary interests in Parcels A, B and C, or, more accurately, the

headquarters building and adjacent parking lot (Parcel A) and Nana's House and the pole barn

and the adjacent parking lot (Parcels B and C).  However, the effective separation of FIGL and

FIC upon conversion of FIC's rehabilitation proceeding to a liquidation proceeding led the

parties initially to assert conflicting claims in the liquidation proceeding with respect to Parcel A

and, in an action in the Albany County Supreme Court, to Parcels A, B and C.  The Albany

County action was removed to the United States District Court for the Northern District of New

York and ultimately transferred on June 11, 2014 to this Court.  See Lawski v. Frontier Ins. Grp.,

LLC (In re Frontier Ins. Grp., LLC), 517 B.R. 496, 502-503 (Bankr. S.D.N.Y. 2014) (CMG) (the

"Abstention Decision"), familiarity with which is assumed.

The Liquidator moved to remand this proceeding to the State Supreme Court and/or for

this Court to abstain on various grounds, which the Abstention Decision addressed.  Id.  The

Court (Morris, C.B.J.)[8] denied the remand/abstention motion based on the role of the Plan in the

dispute.  Noting that confirmation of the Plan would be binding on the parties if the Plan covered

the ownership issue, the Court retained jurisdiction:

> The Court need not step on the toes of the state court by making a determination
> on whether the various contracts between and among the parties grant a right of
> reversion to [FIGI, and its successor FIGL].  The Court need only look to the
> [P]lan and confirmation order to determine whether the property was included in
> the [P]lan, whether the Liquidator's claim was dealt with in the [P]lan, whether

---

[7] See also Direct Testimony of Scott D. Fischer, ¶ 46.
[8] Chief Bankruptcy Judge Morris later recused herself from this adversary proceeding.

the Liquidator is enjoined [under the Plan confirmation order] from proceeding against [FIGL], whether [FIGL] is released from any liability and whether a violation of the discharge has occurred, as was alleged by [FIGL].

Id. at 504.  The Court further held, "If the Court determines that this issue was not covered by the [P]lan, it will send the matter back to state court so that the issue [of who owns the reversionary interests] can be decided under state law."  Id.  Thus, if ownership of Parcels B and C[9] was not "covered by the Plan," Parcels B and C were not "included in the Plan," or the Liquidator's claim to Parcels B and C was not "dealt with in the Plan" as approved and implemented by the order confirming the Plan, all other issues raised by the parties, such as the interpretation of the pre-bankruptcy contracts, the applicability of New York's Statute of Frauds, adverse possession, reformation, and equitable estoppel, will be decided upon remand of this proceeding to the State Supreme Court.

One might think that whether Parcels B and C were covered by the Plan and the confirmation order would be easy to decide, requiring merely an examination of how those documents address the parties' claims to that property.  However, for reasons discussed below the issue of whether Parcels B and C were covered by, included in, or dealt with by the Plan and confirmation order, and, more specifically, the context in which those documents should be read, required fact-finding regarding the nature of FIGI's disclosure of its asserted property interests during its bankruptcy case, the extent of the involvement of the Liquidator's predecessor, the Rehabilitator, in that case, and the parties' mutual understanding of their respective claims to the property at issue when the Plan was confirmed.  Accordingly, after the parties engaged in discovery, the Court conducted a trial on those issues.

---

[9] Although FIGL initially asserted a claim to ownership of Parcel A, it has since waived any such claim.

This Memorandum of Decision states the Court's reasons, based on the trial record, including witness testimony, agreed deposition designations and the exhibits admitted into evidence, as well as the parties' post-trial proposed findings of fact and conclusions of law, for determining that the Plan sufficiently addressed FIGI's ownership of Parcels B and C and their transfer to FIGL for the Court to declare the Liquidator is bound by the Plan and confirmation order not to contest or interfere in FIGL's reversionary ownership of that property, and to direct the IDA to transfer ownership of it to FIGL.

### Jurisdiction

This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 157(a)-(b) and 1334(b) and the Amended Standing Order of Reference, dated January 31, 2012 (Preska C. D.J.). This is a "core proceeding" under 28 U.S.C. § 157(b)(2)(E) and (O) that the Court may determine by a final order under Stern v. Marshall, 564 U.S. 462, 497 (2011), because, as provided in the Abstention Decision, this Court is deciding only issues limited to core aspects of the adjustment of the debtor/creditor relationship: how did the Plan's confirmation affect the parties' prepetition claims to or interests in Parcels B and C, and does the injunction provided for in § 11.08 of the Plan and ¶ 7 of the Court's December 1, 2005 Order confirming the Plan (the "Confirmation Order"),[10] which prevents interference with the Plan or the property covered by the Plan, apply?  See also Travelers Indem. Co. v. Bailey, 557 U.S. 137, 153-55 (2009); Netflix, Inc. v. Relativity Media, LLC (In re Relativity Fashion, LLC), 696 Fed. Appx. 26, 28-29 (2d Cir. 2017); Elliott v. GM LLC (In re Motors Liquidation Co.), 829 F.3d 135, 153-54 (2d Cir. 2016), cert. denied, GM LLC v. Elliott, 137 S. Ct. 1813 (2017).  The Court retains *post-confirmation* jurisdiction because § 12.01(f) of the Plan and ¶ 18 of the Confirmation Order reserve the

---

[10] FIGL Trial Ex. J.

6

Court's jurisdiction to decide such issues, and the dispute clearly has a close nexus to the Plan.
Cohen v. CDR Creances, S.A.S. (In re Euro-American Lodging Corp.), 549 Fed. Appx. 52, 54 (2d Cir. 2014); Ace Am. Ins. Co. v. DPH Hldgs. Corp. (In re DPH Hldgs. Corp.), 448 Fed. Appx. 134, 137 (2d Cir. 2011); SP Special Opportunities, LLC v. LightSquared, Inc. (In re LightSquared, Inc.), 539 B.R. 232, 240-42 (S.D.N.Y. 2015).  Here, FIGL is seeking to enforce the Plan as to Parcels B and C, which 11 U.S.C. § 1142(b) specifically authorizes the Court to direct.  In re Relativity Fashion, 696 Fed. Appx. at 28; Harper v. Oversight Comm. (In re Conco, Inc.), 855 F.3d 703, 711 (6th Cir. 2017).

### The Binding Effect of Plan Confirmation

It is often stated that a chapter 11 plan is a new contract between the debtor and its creditors, albeit one signed only by the plan proponent, in this case FIGI.  In re Conco, 855 F.3d at 711, quoting In re Dow Corning Corp., 456 F.2d 668, 676 (6th Cir. 2006); see also In re Montgomery Ward Hldg. Corp., 306 B.R. 489, 495 (Bankr. D. Del. 2004) (a confirmed plan is "a legally binding agreement"); In re Pettibone Corp., 134 B.R. 349, 351-52 (Bankr. N.D. Ill. 1991) ("A plan of reorganization is a contract which binds the debtor and its creditors.").  References to chapter 11 plans as contracts or agreements -- while useful for purposes of interpreting plans, Silvervan v. Cent. Equities Credit (In re 18th Ave. Realty, Inc.), 2010 Bankr. LEXIS 1553, at *14-15 (Bankr. S.D.N.Y. May 7, 2010) -- are only by analogy, however.  The binding effect of a chapter 11 plan is in fact premised on statutory and common law claim preclusion.  That is, for the debtor, its creditors and holders of interests, the chapter 11 plan is the crucible by which the parties' claims and rights in property dealt with by the plan are transformed and governed post-confirmation -- a "super-contract" -- not because it is signed by all of the parties with claims

against the debtor and holders of interests affected by the plan who participated in the case, but

because of applicable provisions of the Bankruptcy Code and principles of res judicata.

First, in addition to providing for the discharge of a reorganizing debtor under a chapter

11 plan, section 1141 of the Bankruptcy Code prescribes the binding nature of a confirmed plan:

> (a) . . . [T]he provisions of a confirmed plan bind the debtor, any entity issuing
> securities under the plan, any entity acquiring property under the plan, and any
> creditor, equity security holder, or general partner in the debtor, whether or
> not the claim or interest of such creditor, equity security holder, or general
> partner is impaired under the plan and whether or not such creditor, equity
> security holder, or general partner has accepted the plan.

> (b) Except as otherwise provided in the plan or the order confirming the plan, the
> confirmation of a plan vests all property of the estate in the debtor.

> (c) . . . [E]xcept as otherwise provided in the plan or in the order confirming the
> plan, after confirmation of a plan, the property dealt with by the plan is free
> and clear of all claims and interests of creditors, equity security holders, and
> of general partners in the debtor.

11 U.S.C. § 1141(a)-(c).  Thus, a confirmed plan binds, among others, the debtor and its

creditors to its terms and vests all property of the debtor's estate in the reorganized debtor unless

otherwise provided in the plan,[11] and, moreover, can vest the property that is dealt with by the

plan free and clear of all claims and interests of creditors and interest holders even if it was not

necessarily property of the estate pre-confirmation.  Id.[12]

Moreover, the doctrine of res judicata applies to orders confirming chapter 11 plans.

"The confirmation of a plan in a Chapter 11 proceeding is an event comparable to the entry of a

final judgment in an ordinary civil litigation."  Silverman v. Tracar, S.A. (In re Am. Preferred

Prescription, Inc.), 255 F.3d 87, 92 (2d Cir. 2001).  Thus, in addition to the preclusive effects of

---

[11] See also Diamond Z Trailer, Inc. v. JZ L.L.C. (In re JZ L.L.C.), 371 B.R. 412, 418, 420-21 (BAP 9th Cir. 2007)
(section 1141(b) vests property in the debtor post-confirmation regardless whether listed on debtor's schedules,
subject, on a fact based analysis, to principles of judicial estoppel for conflicting post-confirmation claims to
unscheduled assets).
[12] See also authorities cited in the following discussion of the res judicata effect of plan confirmation.

section 1141 of the Bankruptcy Code, "the confirmation order serves as res judicata as to any issues that were or could have been raised in the confirmation proceedings." Bel Air Tollgate Pshp v. Bel Air Square Joint Venture (In re Bel Air Square Joint Venture), 1996 U.S. App. LEXIS 2478, at *4 (2d Cir. Jan. 16, 1996). See also Iberiabank v. Geisen (In re FFS Data, Inc.), 776 F.3d 1299, 1306 (11th Cir. 2015); Baeshen v. Arcapita Bank B.S.C.(c) (In re Arcapita Bank B.S.C.(c)), 520 B.R. 15, 22 (Bankr. S.D.N.Y. 2014); In re Estill Med. Techs., 2004 Bankr. LEXIS 333, at *11-12 (Bankr. N.D. Tex. Mar. 26, 2004). See generally United Student Aid Funds, Inc. v. Espinosa, 559 U.S. 260, 275 (2010). Res judicata has specifically been applied to preclude post-confirmation assertion of contrary ownership interests by third parties who participated in the case. See, e.g., In re Estill Med. Techs., Inc., 2004 Bankr. LEXIS 333, at *9-12.

In addition, the Second Circuit recognizes considerations beyond the normal parameters of res judicata[13] apply to plan confirmation orders, among other bankruptcy orders that deal with claims to or rights in property of the debtor's estate. Brown Media Corp. v. K&L Gates, LLP, 854 F.3d 150, 157-58 (2d Cir. 2017):

> Unlike a typical lawsuit, where one party brings an action against another, a bankruptcy proceeding provides a forum for multiple parties – debtors, creditors bidders, etc. – to sort out how to allocate, among other things, a debtor's assets. In other words, a bankruptcy court's foremost concern is maximizing the value of the debtor's estate. . . . In the bankruptcy context, therefore, instead of examining whether a subsequent lawsuit asserts claims that could have been included as part of a previous lawsuit, courts have assessed whether a new action seeks to bring

---

[13] "To determine whether the doctrine of res judicata bars a subsequent action, we consider whether 1) the prior decision was a final judgment on the merits, 2) the litigants were the same parties [or the interests of the subsequent litigant were adequately represented by the prior litigant in the prior litigation], 3) the prior court was of competent jurisdiction, and 4) the causes of action were the same." Celli v. First Nat'l Bank (In re Layo), 460 F.3d 289, 292 (2d Cir. 2006) (citation omitted). "Whether or not the first judgment will have preclusive effect depends in part on whether the same transaction or series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present in the first." Monahan v. New York City Dept of Corrections, 214 F.3d 275, 285 (2d Cir. 2000) (citation omitted).

> claims that could have been raised and litigated within the scope of the
> bankruptcy proceeding.

Id. at 158 (citation omitted).  See also id. at 157:  "In the bankruptcy context, we ask as well

whether an independent judgment in a separate proceeding would impair, destroy, challenge, or

invalidate the enforceability or effectiveness of the reorganization plan."

Thus, because a chapter 11 plan allocates the debtor's property and claims to such

property in a collective setting (the "transaction" for res judicata purposes being the plan's

allocation of all of the debtor's property and the claims against it), claims to property of the

estate are reviewed for res judicata purposes in the context of whether they were or could have

been raised pre-confirmation.  Depending on the context, this may include claims asserting that

an asset is not property of the debtor's estate.  As stated by the court in In re Arcapita Bank:

> [T]he Plaintiffs argue . . . a plan confirmation cannot confer upon a debtor title to
> another's property.  But the Court disagrees with the Plaintiffs' framing of the
> issue.  While it is true that a party has the right to contest what constitutes
> property of the estate, this issue was resolved in the plan of reorganization that
> was approved by the Confirmation Order.  This is hardly surprising, given that an
> understanding or what constitutes property of the estate is central to determining
> the distribution to creditors in any plan of reorganization.

520 B.R. at 22-23.  See also In re Estill Med. Techs., 2004 Bankr. LEXIS 333, at *11 ("The issue

of Eagle having such an ownership interest could have been and should have been raised during

the confirmation process.  It is black letter law that such an issue is disposed of through

confirmation of a plan if not raised before the entry of the confirmation order.").

If the terms of the plan itself do not clearly resolve the issue, moreover, courts examine

the case context to determine whether creditors are bound by the plan and the order confirming it

with regard to their post-confirmation claims to estate assets.  In other words, context can define

the collective transaction set forth in the confirmed plan that then governs based on statutory and

common law preclusion principles:  what did the parties understand or what could they reasonably have understood about the debtor's claims to property, including as set forth in the debtor's official schedules of assets and the disclosure statement that is required to be approved before one can solicit votes on a plan, and could a dispute over such a property interest have been litigated before plan confirmation?  And, then, did the plan conform to that understanding? See, e.g., In re Conco, 855 F.3d at 712-14; Sure-Snap Corp v. State St. Bank and Tr. Co., 948 F.2d 869, 873-74 (2d Cir. 1991); Pemberthy v. Chickering, 2017 U.S. Dist. LEXIS 6153, at *4-7 (S.D.N.Y. Jan. 13, 2017); and In re Arcapita Bank, 520 B.R. at 23-24, which refer not only to the plan itself but also to the debtor's schedules of assets and liabilities, the disclosure statement for the plan, or both to determine the res judicata effect of the confirmation order on subsequently contested claims to or interests in property.  See also Adelphia Recovery Trust v. Goldman Sachs & Co., 748 F.3d 110, 118 (2d Cir. 2014), which found that a debtor's successor in interest under a confirmed plan was judicially estopped to claim an asset based on the asset's omission from the debtor's schedules and the fact that "[a]t no time during these proceedings did [the debtor] or any party attribute ownership of [the asset in question] to [the debtor]";[14] In re House Nursery, Ltd., 2016 Bankr. LEXIS 409, at *18-22 and 25-26 (Bankr. E.D. Tex. Feb. 9, 2016) (examining context of plan negotiations and statements to the court at the confirmation hearing to determine effect of plan provision:  "[T]he Bank cannot simply isolate chosen words now from the context from which they arose and thereby achieve a different result from that contemplated by the parties at the time of the confirmation of the plan.  Due to principles of res judicata, it does not possess such discretion.").

---

[14] The Adelphia court employed a judicial estoppel analysis rather than a claim preclusion analysis. Nevertheless, the same principle that all parties to the bankruptcy case are bound by the collective allocation of the debtor's assets, as reflected in the debtor's disclosures and ultimately through the confirmed plan, applied.  Id.

11

Thus, a creditor with a claim to, or an asserted interest in, an asset therefore may lose that interest if, knowing the debtor's contrary claim, it lets a plan be confirmed without contesting the debtor's position; on the other hand, a post-confirmation debtor may be precluded from subsequently claiming an asset that was not sufficiently claimed during the chapter 11 case.  As stated in In re Arcapita Bank, 520 B.R. at 28-29:  "Taken together, the disclosure statement and the confirmed plan control how the Funds [in which a third party was asserting an interest post-confirmation] would be handled. . . .  The Plaintiffs could have contested all these issues [in the Funds] at several points prior to confirmation.  But they did not.  Allowing the Plaintiffs' claims [to the Funds now] would effectively disrupt the reorganization plan."  See also United States v. Goff, 2005 U.S. Dist. LEXIS 49884, at *40-41 (D. Idaho Jan. 7, 2005), in which the court observed,

> Lest Plaintiff complain about its treatment under Defendant's confirmed Plan, the Court reminds Plaintiff that the provisions of Chapter 11 provided ample protection for Plaintiff's secured rights and that Plaintiff was given multiple opportunities during the plan confirmation process to raise any concerns it may have had about the treatment of its claims.  Under Chapter 11, it is the creditor's responsibility to speak up; the debtor has no affirmative duty to safely shepherd the secured creditor through the confirmation process,

and In re Estill Med. Techs., 2004 Bankr. LEXIS 333, at *12-13 (noting absence of any discussion of a third party's "valuable property right" in disclosure statement for the plan, court opined that the third party, which was active in the case, should have raised the issue if it wanted to protect its interest).

There is currently a judicial gloss on this latter point, that a party stays silent at its peril, as applied to 11 U.S.C. § 1141(c), which states that, except as provided in the plan, property "dealt with" by a confirmed plan shall be free and clear of the claims and interests of creditors. As to secured creditors and holders of other interests in property, section 1141(c) extinguishes

12

such interests if (1) the plan is confirmed, (2) the property subject to the interest is "dealt with" by the plan, (3) neither the plan nor the confirmation order preserves the interest, and, lastly, although this requirement -- unlike the first three -- is not expressly set forth in section 1141(c), (4) the holder of the interest *participated* in the bankruptcy case.  City of Concord, N.H. v. N. New Eng. Tel. Operations LLC (In re Northern New England Telephone Operations, LLC), 795 F.3d 343, 346-48 (2d Cir. 2015).

Section 1141(c)'s "dealt with" requirement is satisfied by, among other things, a plan provision stating that "all property" of the debtor shall be free and clear of claims, liens and interests, id. at 349, that is, a *general* reference that would encompass the property at issue, in light of the principle that "creditors have a responsibility to take an active role in protecting their claims.  And that latter principle allows a plan to deal in broad strokes with property subject to liens."  Id. (internal citation and quotation omitted).  See also United Indep. Sch. Dist. v. Vitro Asset Corp. (In re Vitro Asset Corp), 656 Fed. Appx. 717, 723-24 (5th Cir. 2016); Airadigm Commc'ns, Inc. v. FCC (In re Airadigm Commc'ns, Inc.), 519 F.3d 640, 649 (7th Cir. 2008) (property is "dealt with" for purposes of section 1141(c) when there is "some evidence that the powers to affect the creditor's interest contained in the bankruptcy code . . . have in some way been exercised [in the plan] – whether expressly or impliedly").

The currently judicially imposed "participation" requirement for purposes of section 1141(c) goes beyond mere due process concerns; it is satisfied only if the holder of a property interest took some action in the bankruptcy case, as distinguished from merely receiving notice and failing to act.  In re Ahern Enter., 507 F.3d 817, 822-23 (5th Cir. 2007).  "Participation" includes, among other things, filing a proof of claim where circumstances indicate that it is related to the interest at issue, In re Northern New England Telephone Operations, 795 F.3d at

13

350, negotiating with the debtor over the terms of the plan with knowledge of the disputed

interest, <u>Baker Hughes Oilfield Operations, Inc. v. Morton</u> <u>(In re R.L. Adkins Corp.)</u>, 784 F.3d

978, 981 (5th Cir. 2015) (concurring opinion), or actively participating in the bankruptcy case

with knowledge that its interest might be disputed, and having the opportunity to object to the

plan.  <u>Universal Suppliers, Inc. v. Reg'l Bldg. Sys.</u> <u>(In re Reg'l Bldg. Sys., Inc.)</u>, 254 F.3d 528,

529, 532 (4th Cir. 2001).[15]  As discussed in <u>Reg'l Bldg. Sys.</u>, nothing more is required under the

statute because in chapter 11 cases parties in interest collectively need to rely on the plan

proponent's position regarding the estate's assets unless a countervailing position is timely

identified:  "[I]t would be imprudent for any creditor to accept a debtor's property as satisfaction

for his claim without knowing whether some unidentified third party is lying in wait with a lien."

<u>Id.</u> at 533.

## Discussion

Certain aspects of the foregoing analysis are easily applied to the evidence at trial.  First,

it refutes the Liquidator's position that New York's Statute of Frauds requires a signed deed

transferring the reversionary interests in Parcel B and C to FIGL.  To the contrary, section

1141(a)-(c) of the Bankruptcy Code preempt New York's Statute of Frauds by providing for the

vesting of property, including real property, upon confirmation of the Plan without a deed.

Separately, a deed is not required for the application of <u>res judicata</u> for plan purposes.

There is also no question that the Rehabilitator (and thus his successor, the Liquidator),

"participated" in FIGI's case for purposes of section 1141(c) of the Bankruptcy Code under <u>In re</u>

<u>Northern New England Telephone Operations</u>, 795 F.3d at 350, and the other authorities cited

---

[15] <u>See</u> <u>also</u> <u>FDIC v. Union Entities</u> <u>(In re Be-Mac Transport Co.)</u>, 83 F.3d 1020, 1027 (8th Cir. 1996) (lienholder did
not "participate" for purposes of section 1141(c) where it was neither allowed to file a secured claim because it
missed the claims bar date, nor, consequently, to vote on the plan as a secured creditor).

above that add a participation requirement to that section.  The Rehabilitator filed a $43,230,580

proof of claim in this case;[16] actively negotiated his claims with FIGI and IMG (which the parties

ultimately settled in a complex settlement agreement[17] that was (a) attached to the Plan

Supplement[18] filed before the confirmation hearing, (b) incorporated in § 4.11 of the Plan, and

(c) approved in ¶¶ E.x. and 6 of the Confirmation Order); and even voted to accept the Plan.[19]

The Rehabilitator never objected to confirmation of the Plan on the basis that he claimed the

revisionary interest in Parcels B and C or the buildings on them, or otherwise raised any claim to

that property in the chapter 11 case.

It also appears that the Rehabilitator did nothing to preserve his interest in Parcels B and

C.  Indeed, the Rehabilitator's proof of claim[20] is filed as an unsecured non-priority proof of

claim and does not identify any dispute over, or claimed interest in, Parcels B and C, or Nana's

House, the pole barn or the parking lot next to them.

The Plan and Confirmation Order also provided that they were binding on, among others,

FIGI and its creditors, which would include the Rehabilitator.  Confirmation Order ¶ 8; Plan §

11.09 ("The rights, benefits and obligations conferred on any Person by the Plan will be binding

upon and inure to the benefit of the executors, successors, heirs and assigns of and any Persons

claiming an interest in any and all property in which [FIGI] has an interest within the meaning of

section 541 of the Bankruptcy Code through such Person.").

Finally, ¶ 15 of the Confirmation Order and pages 3 and 7 (definition of "Assets" and

"Estate") and 11 (definition of "Trust Assets") and Article IV and §§ 6.01(h) and 11.01 of the

---

[16] FIGL Trial Ex. G.
[17] FIGL Trial Ex. H.
[18] FIGL Trial Ex. F.
[19] FIGL Trial Ex. I (Declaration Certifying Results of Voting) at Ex. A, p. 1.
[20] FIGL Trial Ex. G.

Plan provided, consistent with section 1141(b) of the Bankruptcy Code, that all of the property of FIGI's estate with the exception of specific "Trust Assets" and 100% of FIC's stock (which would be distributed to IMG) would vest post-confirmation in the reorganized debtor, FIGL (which would be under IMG's ultimate control).[21]  Because the specifically listed Trust Assets do not include the headquarters building, Nana's House, the pole barn, or the land on which they sit, including the adjacent parking lot, the Plan and Confirmation Order thus defined the property of FIGI's estate that they vested in FIGL in a way that satisfies the "identification" or "dealt with" requirement of In re Northern New England Telephone Operations, 795 F.3d at 349; In re Vitro Asset, 656 Fed. Appx. at 723-24; and In re Airadigm Commc'ns, 519 F.3d at 649, for purposes of section 1141(c), *assuming*, for the moment, that, in the context of its chapter 11 case, FIGI sufficiently identified those assets as property of its estate for purposes of the Plan.

What remains to be determined, then, is whether FIGI's reversionary interest in Parcels B and C was sufficiently identified during the course of its chapter 11 case such that the Rehabilitator's failure to claim a contrary interest became binding on the Rehabilitator (and thus the Liquidator) under the foregoing authorities after Plan confirmation.

### A.  The pre-bankruptcy transfer documents.

The documentary evidence shows that the parcels comprising the Rock Hill Property were acquired before FIGI's bankruptcy case by FIC (Parcel A, by deed dated January 4, 1991)[22] and FIGI (Parcels B and C, by deed dated January 28, 1993), respectively.[23]  Thereafter, still several years prepetition, FIGI and FIC took advantage of a tax abatement program with the

---

[21] Plan at 3, 7, Art. IV and §§ 6.01(h) and 11.01, Liquidator Tr. Ex. 29.
[22] Liquidator Trial Ex. 1.
[23] Liquidator Trial Ex. 2.

IDA.[24]  Under that program, legal title to Parcels A, B, and C was separately transferred to the

IDA.  FIC transferred Parcel A, the future site of FIGI and FIC's corporate headquarters and

adjacent parking lot, to the IDA by a deed dated February 25, 1993.[25]  FIGI transferred Parcel B,

which was to be an additional parking lot,[26] to the IDA by a deed dated February 16, 1994.[27]  By

deed dated February 26, 1997, FIGI transferred Parcel C, where Nana's House daycare center

was to be located, to FIC, and FIC on the same day transferred it to the IDA.[28]

Relatedly, as part of the Sullivan County tax abatement program, FIGI (as to Parcel B)

and FIGI and FIC (as to Parcels A and C) were required to make payments to the IDA pursuant

to Payment in Lieu of Taxes agreements ("PILOT Agreements"), which were periodically

updated as parcels or buildings on them were added, the last PILOT Agreement, covering all of

the Rock Hill Property, being entered into by FIGI, FIC and the IDA on August 1, 1999 in

connection with building the daycare center and pole barn on Parcel C.[29]

The final set of agreements pertaining to the tax abatement program comprised an

Installment Sale Agreement between the IDA and FIC, dated as of December 1, 1993,[30] a First

Supplemental Sale Agreement between the IDA and FIC, dated as of February 26, 1997,[31] and a

Second Supplemental Sale Agreement between the IDA and FIC, dated as of September 1,

1999.[32]  Each of these agreements provides that upon completion of the respective PILOT

Agreements, the IDA shall convey title to the parcel covered by the agreement to the

---

[24] FIGL's Proposed Findings of Fact, ¶ 23; Liquidator's Proposed Findings of Fact and Conclusions of Law, ¶ 9.
[25] Liquidator Trial Ex. 5.
[26] Liquidator's Proposed Findings of Fact ¶ 16.
[27] Liquidator Trial Ex. 7.
[28] Liquidator Trial Exs. 8 and 9, respectively.
[29] Liquidator Trial Ex. 12; Liquidator's Proposed Findings of Fact ¶¶ 21-23; FIGL's Proposed Findings of Fact ¶¶ 25-30.
[30] Liquidator Trial Ex. 4.
[31] Liquidator Trial Ex. 11.
[32]Liquidator Trial Ex. 13.

"Company," which is defined in each agreement as FIC.[33]  Payments under the PILOT

Agreements were completed on or about February 18, 2014, and the PILOT arrangement expired

on February 28, 2014.[34]  However, given FIGL's assertion to the IDA of a contrary interest in the

parcels, the IDA did not transfer title to the Liquidator as provided in sale agreements.[35]  Instead,

the Liquidator commenced this proceeding, since removed, in state court.  It is clear from the

foregoing documentary evidence, though, that the IDA agreed to transfer its interest in each of

Parcels A, B and C to FIC after the completion of the PILOT payments.  That is, under the pre-

bankruptcy documents, FIC, not FIGI had the reversionary interest in all three parcels.[36]

### B. The bankruptcy documents and other evidence.

The trial record is equally clear, however, that during the critical period of FIGI's

bankruptcy case both FIGI and the Rehabilitator treated the reversionary interests in the land on

which Nana's house and the pole barn sit and the adjacent parking lot, or Parcels B and C, as

FIGI's property and that the Plan was confirmed with that understanding.  Indeed, the testimony

to that effect not only is credible, the Liquidator does not challenge it.

### i.    The bankruptcy documents.

FIGI originally listed both its headquarters building (which sits on Parcel A) and Nana's

House and the pole barn (both of which sit on Parcel C) in its official schedule of real property,

filed pursuant to 11 U.S.C. § 521, as constituting property of its bankruptcy estate under 11

U.S.C. § 541.[37]  In each case, the original schedule stated that the nature of FIGI's interest was as

---

[33] Liquidator Trial Ex. 4 at ¶¶ 5.1-5.2 (covering Parcel A); Liquidator Tr. Ex. 11 at ¶¶ 5.1-5.2 (separately covering each of Parcels A and B (listed independently but defined together as the "Original Parcel") and C (defined as the "Additional Parcel"); Liquidator Tr. Ex. 13 at ¶¶ 5.1-5.2 (separately covering all three parcels).
[34] Direct Testimony of Scott D. Fischer, ¶ 49.
[35] Id.,¶ 50.
[36] Given that FIC was a wholly-owned subsidiary of FIGI, It is also evident that this fact was of little practical consequence until FIC entered the rehabilitation proceeding years after the IDA/FIC sale agreements.
[37] Liquidator Tr. Ex. 24.  It valued the Nana's House interest at $1 million and the pole barn interest at $300,000.

18

"Successor in Interest to [the IDA],"[38] which clearly suggests a reversionary interest in FIGI, not

FIC, contrary to the IDA/FIC prepetition sale agreements.  Consistent with the trial testimony

discussed below, FIGI later amended its schedule of real property to delete its claim to the

headquarters property, or Parcel A; otherwise, however, FIGI's official schedule of property of

its estate stayed the same through the confirmation of the Plan, claiming Nana's House and the

pole barn as property of its estate.[39]

The Plan defined FIGI's "Estate" simply as "the estate of the Debtor created by section

541 of the Bankruptcy Code upon the commencement of the Chapter 11 Case on the Petition

Date."[40]  FIGI's "Estate" therefore would include all of FIGI's assets listed on FIGI's official

schedule of assets under 11 U.S.C. § 521, unless, as discussed above, a contrary claim to such

property was timely raised and determined adversely to FIGI pre-confirmation.  As noted, no

such contrary claim was raised as to the property at issue here, including in FIC's proof of claim.

The Plan then defined "Assets" as "including any property of the Estate for purposes of section

541 of the Bankruptcy Code,"[41] and, as noted above, stated that on the Plan's Effective Date "the

Assets of the Debtor, except for the Trust Assets, shall revest in [FIGL] pursuant to section 11.01

hereof."[42]  Because the Plan defined the "Trust Assets" (which the Plan provided would be

transferred to a trust for the benefit of all creditors, including FIC)[43] as the specific assets listed

in the definition of "Trust Assets," and that list did not include the property at issue here,[44] it is

clear that the Plan provided for the transfer of at least Nana's House and the pole barn to FIGL.

[38] Id.
[39] Liquidator Tr. Ex. 27.  FIGI's official schedule of executory contracts and leases separately listed its lease of Nana's House and the pole barn, with the IDA as lessor.  Id.
[40] Plan at 7, Liquidator Tr. Ex. 29.
[41] Id. at 3.
[42] Id. § 6.01(h).
[43] Id. at 11; Art. IV.
[44] Id. at 11.

Moreover, one can reasonably assume that by listing Nana's House and the pole barn in its schedule of assets, FIGI was including the land on which those structures sit among its assets, as well. As noted, Nana's House and the pole barn did not have an address separate from the general Rock Hill Property address, although they sit on property that FIGI, FIC and the Rehabilitator treated separately from the headquarters building and its adjacent parking lot on Parcel A. It would have been misleading to have identified Parcel C by the Rock Hill Property address because that address also applied to Parcel A, which FIGI did not claim as its property in its amended schedule of assets (and which FIGI also identified in its original asset schedule by the building on it -- the headquarters building).

The Liquidator contends, to the contrary, that such a description was inadequate, suggesting that FIGL should have used a metes and bounds description instead. Such detail, however, is neither required nor in the Court's experience common for a debtor's official schedule of assets under 11 U.S.C. § 521. It is well established that such a schedule need only reasonably identify the assets to parties in interest. Eun Joo Lee v. Forster & Garbus LLP, 926 F. Supp. 2d 482, 489 (E.D.N.Y. 2013), citing Cusano v. Klein, 264 F.3d 936, 946 (9th Cir. 2001) (schedule adequate where "listing was not so defective that it would forestall a proper investigation of the asset"). See also Donarumo v. Furlong (In re Furlong), 660 F.3d 81, 87 (1st Cir. 2011) (citation and internal quotation marks omitted) ("generally, an asset is adequately scheduled if its description exhibits reasonable particularization under the circumstances"); Payne v. Wood, 775 F.2d 202, 205, 207 (7th Cir. 1985) (debtor required only to "do enough itemizing to enable the trustee to determine whether to investigate further"); 4-521 Collier on Bankruptcy ¶ 521.06[1] (16th ed. 2017): "There are no bright-line rules for how much itemization and specificity is required [in the debtor's schedules of assets and liabilities]. A

20

debtor is required to be as particular as is reasonable under the circumstances.  The purpose of

the schedules is to give interested parties sufficient information to decide whether they want to

engage in further inquiry."

In the Court's experience, parties in bankruptcy cases routinely identify real property by

its address, not by a metes and bounds description, or by a building on the site.  Here, as noted,

Parcels A, B and C shared the same Rock Hill Property address, which required another means

of their identification.  By listing the buildings on Parcel C in its schedule of assets FIGI

sufficiently put the Rehabilitator and other parties in interest on notice of its claim to the land on

which they sit.

Nor, contrary to the Liquidator's assertion, does the Disclosure Statement for the Plan

indicate that FIGI was *not* claiming an interest in Parcel C.  There is nothing in the Disclosure

Statement directly contradicting FIGI's official schedule of its assets -- which the Disclosure

Statement identifies[45] -- and the Disclosure Statement's description of the Plan is consistent with

Article IV, §§ 6.01(h) and 11.01 of the Plan and the Plan's related definitions of "Assets,"

"Estate" and "Trust Assets."[46]

The Liquidator argues, nonetheless, that because the Disclosure Statement described

another real property -- the "Monticello Property," which was subject to a $900,000 sale contract

-- as "the Debtor's most significant physical asset" -- without identifying Parcel C,[47] FIGI was

abjuring its interest in Parcel C.  This conclusion is not warranted given the context of the

Disclosure Statement, however.  In October 2005, the Monticello Property *was* the Debtor's

most significant physical asset; its sale proceeds would be used to satisfy administrative claims,

---

[45] Disclosure Statement at 19, IV.E.1, Liquidator's Tr. Ex. 31.
[46] Id. at 27-32.
[47] Id. at 13-14, III.D.1; 69, X.D.2(f).

including IMG's debtor in possession loan, which would need to be paid upon the Plan's

effective date or waived for confirmation to occur, as well as to fund the creditor litigation

trust.[48]  Parcels B and C, on the other hand, would revert to FIGI only after the completion of the

PILOT payments -- which FIGI lacked the cash to continue to make without IMG's support --

several years in the future, in February 2014.

The general creditors therefore had no real interest in Parcels B and C.  As summarized

on page 1 of the Disclosure Statement and its discussion of the Plan, in sum, the Plan provided

that IMG, by far the largest creditor, would receive 100% of the stock of FIGI/FIGL, and,

through FIGL, control over FIGI's subsidiaries with the exception of FIC (and the possibility of

regaining control over FIC depending on the course of the rehabilitation proceeding), while the

other creditors would receive distributions from the liquidation of FIGI's causes of action

assigned to a creditor trust that IMG would fund with $250,000 and FIGI would fund with

available cash.  FIGI/FIGL's retention of the long-term reversionary interest in Parcels B and C

was consistent with this. The only parties in interest that were going to have a long-term

relationship with FIGI's real property were IMG, through FIGL, and the Rehabilitator, through

FIC, and, as discussed below, the evidence is clear that each of those parties, as well as FIGI,

believed that not only the reversionary interest in Parcel C but also in Parcel B belonged to

FIGI.[49]

Based on all of the foregoing, although one could rely solely on the description of Parcel

C in FIGI's schedule of assets and the Rehabilitator's proof of claim, which failed to assert a

---

[48] Id. at 14, III.D.1.  11 U.S.C. § 1129(a)(9).
[49] Suzanne Loughlin was the only witness who was a FIGI representative at the time of the chapter 11 case.  Among her duties was overseeing FIGI's professionals in the preparation of FIGI's schedules and Disclosure Statement. September 12, 2016 Trial Transcript, filed November 7, 2016 ("Trial Tr.") at 106-107.  She credibly testified about the foregoing reasons for referring to the Monticello Property but not Parcels B and C in the Disclosure Statement. Id., at 109-110, 113.

contrary interest in it, and his vote in favor of the Plan, the Court determines that the Plan and

Confirmation Order preclude the Liquidator from further pursuing any interest in Parcel C and

require that the IDA deliver title in Parcel C to FIGL.[50]

ii.    The parties' bankruptcy understandings, and judicial estoppel.

This leaves whether the Plan's generic description of the "Assets" to be transferred to

FIGL suffices to include FIGI's reversionary interest in Parcel B, or, instead, whether FIGI's

successor under the Plan, FIGL should be judicially estopped from claiming Parcel B as an asset

post-confirmation based on FIGI's failure to specifically disclose Parcel B in its Disclosure

Statement and schedule of assets.

The failure to schedule an asset under 11 U.S.C. § 521 or otherwise to reasonably identify

it in the disclosure statement or chapter 11 plan has often led courts to preclude the assertion of

an interest in the asset by the debtor's successor in later litigation.  See, e.g., Adelphia Recovery

Trust v. Goldman Sachs & Co., 748 F.3d at 118-19; BPP Ill., LLC v. Royal Bank of Scot. Grp.

PLC, 859 F.3d 188, 192-94 (2d Cir. 2017) (applying Fifth Circuit law).  The equitable doctrine

of judicial estoppel depends heavily on the specific factual context and is "probably not reducible

to any general formulation of principle."  New Hampshire v. Maine, 532 U.S. 742, 749-51

(2001) (citations omitted); Adelphia Recovery Trust v. Goldman Sachs & Co., 748 F.3d at 118.

Nevertheless, construing New Hampshire v. Maine, 532 U.S. at 750-51, courts generally will

apply judicial estoppel "if:  [A] a party's later position [in a legal proceeding] is clearly

inconsistent with its earlier position; [B] the party's former position has been adopted in some

---

[50] The Liquidator has also argued that because at some time during the IDA's ownership Parcels A, B and C were combined in one tax deed, the IDA now is unable to transfer parcels B and C to the proper reversionary party separate from Parcel A.  The respective Installment Sale Agreements under the PILOT program separately identify the three parcels, however, and, consistent with the Plan and 11 U.S.C. §§ 1141(a)-(c) and 1142, the Court has the power to direct the IDA to make the transfers.

way by the court in the earlier proceeding; and [C] the party asserting the two positions would

derive an unfair advantage against the party seeking estoppel," <u>BPP Ill., LLC v. Royal Bank of</u>

<u>Scot. Grp. PLC</u>, 859 F.3d at 192 (internal quotations omitted), although the Second Circuit does

not always require a showing of unfair advantage. <u>Id.</u> at 194; <u>Adelphia Recovery Trust v.</u>

<u>Goldman Sachs & Co.</u>, 748 F.3d at 116.

In a chapter 11 case, the court's "adoption" of a party's position includes the court's

confirmation of a party's plan that, for purposes of 11 U.S.C. § 1141(a)-(c), deals with another

party's rights or claims. And, as discussed above, the position taken by the debtor or plan

proponent in the disclosure statement or official schedules may be read into the plan that the

court confirms and therefore also may be "adopted" by the court upon plan confirmation.

<u>Adelphia Recovery Trust v. Goldman Sachs & Co.</u>, 748 F.3d at 117.

There is a tension, however, over the ultimate purpose and proper scope of judicial

estoppel. At one level, it is intended to prevent litigants from making "a mockery of the judicial

system" by knowingly inducing courts to take inconsistent positions on the same legal issue

"according to the exigencies of the moment." <u>See</u> <u>Slater v. United States Steel</u>, 871 F.3d 1174,

1180-81 (11th Cir. 2017); <u>see also</u> <u>New Hampshire v. Maine</u>, 532 U.S. at 750. Recognizing the

importance, usually to multiple parties, of accurate disclosure in the bankruptcy context, some

courts therefore have applied judicial estoppel upon any intentional failure to disclose, even

when the party invoking judicial estoppel was not a party to the bankruptcy case and therefore

not adversely affected by the non-disclosure. <u>Eastman v. Union Pac. R.R.</u>, 493 F.3d 1151 (10th

Cir. 2007); <u>see also</u> <u>Adelphia Recovery Trust v. Goldman Sachs & Co.</u>, 748 F.3d at 117-20

(applying judicial estoppel without discussing whether Goldman Sachs was a party to the

Adelphia chapter 11 case or adversely affected by Adelphia's non-disclosure, with the exception

of "having to unravel all previous proceedings to determine what would have happened had appellant or its predecessors in interest claimed ownership of the [asset] in a timely fashion"). For such courts, if New Hampshire v. Maine's third factor is to be considered at all in the bankruptcy context, it should be read as asking whether the party asserting the two positions would, *or did*, derive an unfair advantage *over anyone*, not whether it would "impose an unfair detriment *on the opposing party* if not estopped." 532 U.S. at 751 (emphasis added).

Other courts take a more nuanced view of the analysis in the bankruptcy context, however, and consider all the circumstances of the case in order to reduce the risk that the party invoking the doctrine "will receive an unjustified windfall or that innocent creditors will be harmed." Slater v. United States Steel, 871 F.3d at 1187 (also noting the fundamental point that judicial estoppel is an *equitable* doctrine); see also Greenheart Durawoods, Inc. v. PHF Int'l Corp., 1994 U.S. Dist. LEXIS 16509, at *6 (S.D.N.Y. Nov. 15, 1994); In re JZ L.L.C., 371 B.R. at 421, 426 ("Diamond Z argues that JZ's nondisclosure of the license judicially estops JZ from prosecuting the state court action. But Diamond Z does not attempt to show its hands are clean."); MF Glob. Hldgs. USA Inc. v. Heartland Co-Op (In re MF Glob. Hldgs. Ltd.), 2017 Bankr. LEXIS 1025, at *15 (Bankr. S.D.N.Y. Apr. 13, 2017). See generally Krystal Cadillac-Olds GMC Truck, Inc. v. GMC, 337 F.3d 314, 319 (3d Cir. 2003) (citation omitted) (requiring that "no lesser sanction would adequately remedy the damage").

Such a nuanced approach to judicial estoppel in the bankruptcy context is appropriate. At a minimum it is necessary to ensure that innocent creditors (that is, those who cannot be said to have "taken" the debtor's position in its schedules or disclosure statement) are not harmed by the debtor's failure to disclose, Greenheart Durawoods, Inc. v. PHG Int'l Corp., 1994 U.S. Dist. LEXIS 16509, at *6, especially where the party asserting judicial estoppel was not itself a party

to the bankruptcy case, or it knew of the debtor's claim to the asset notwithstanding the

nondisclosure, or the debtor's ownership of the undisclosed asset is incontestable.  Moreover,

even where the debtor's ownership of the asset was not clear in a chapter 11, as in Adelphia

Recovery Trust, 748 F.3d at 118, to apply the doctrine to cut off a debtor's successor's standing

to assert a claim to the asset post-confirmation seemingly would defy congressional intent as

expressed in 11 U.S.C. § 1141(b), an issue not addressed by the court in Adelphia.  See, e.g., In

re JZ L.L.C., 371 B.R. at 421; Idearc Media LLC v. Glassman, 2011 U.S. Dist. LEXIS 14865, at

*4 (E.D. Pa. Feb. 14, 2011) (noting that under 11 U.S.C. § 1141(b), unlike in chapter 7 cases,

"except as otherwise provided in the plan or the order confirming the plan, confirmation of a

plan vests *all* of the property of the estate in the debtor"), which argues that one should act with

care before divesting a debtor's successor (usually an entity charged with satisfying creditors'

claims) of a property interest on equitable grounds.

        The present case, with its own unique fact pattern for judicial estoppel purposes,

highlights why the doctrine should be applied flexibly when a debtor fails to disclose an asset.

First, FIGI's non-disclosure of Parcel B did not harm its general creditors.  As discussed above,

given FIGI's financial condition, capital structure and the fact that Parcel B would not revert to

FIGI for several years even if FIGI had the wherewithal to make the PILOT payments -- which it

lacked without the assistance of FIGL's parent, IMG -- the asset's disclosure on FIGI's

schedules would not have been material to anyone with the exception of IMG and the

Rehabilitator.  In addition, the nondisclosure was by the debtor, FIGI, not IMG or FIGL, which

is now asserting the interest in Parcel B on the basis of IMG's claims against FIGI as

restructured under the Plan.  Although it is fair to say that IMG played a large role in negotiating

the Plan, it does not appear that the non-disclosure was caused by IMG or that it was willful or

malicious on FIGI's part.[51]  Indeed, it is clear that parties during the bankruptcy case did not

think of Parcels A, B and C; they thought of the separate buildings and the parking lots adjacent

to them:  the headquarters building, on the one hand, and Nana's House and the pole barn, on the

other, with their respective adjacent parking lots.[52]  By scheduling Nana's House and the pole

barn, therefore, FIGI came almost as close to identifying what the parties now refer to as Parcel

B, the parking lot next to them, as they did to identifying Parcel C.

Finally and most importantly, as noted above it is clear that notwithstanding the fact that

FIGI did not specifically disclose its interest in Parcel B in its schedules or anywhere else, FIGI,

IMG and -- critically -- the Rehabilitator understood when the Plan was confirmed that FIGI, not

FIC, had the reversionary interest not only in Parcel C but also Parcel B.  This was not simply a

mutual misunderstanding.  The parties were aware of the contrary prepetition documentation

summarized above and nevertheless took the position that both parcels would revert to FIGI (and

its successor under the Plan) upon completion of the PILOT payments.  Because the Plan was

confirmed with that understanding, as between FIGL and the Liquidator judicial estoppel should

not overcome the effect of 11 U.S.C. § 1141(a)-(c) and res judicata to unwind it.

Neal Conolly was from January 2002 through confirmation of the Plan the

"administrator" of FIC in rehabilitation under the ultimate supervision of the Insurance Bureau, a

job he likened to being FIC's chief executive officer.[53]  He had authority to file the

---

[51] See testimony of John A. Petrillo, Sr. Vice President, Secretary and General Counsel of FIGL and IMG's point
person during the Plan process, Trial Tr., at 137-141.  No testimony was taken of any of FIGI's personnel or
professionals with the exception of Suzanne Loughlin, about the non-disclosure.  Her trial testimony did not show
any intent to hide the ball regarding Parcel B.  Id., at 109-110, 113.

[52] Id., at 99 (testimony of Suzanne Loughlin); Id., at 137 (testimony of John A. Petrillo): "That's the problem with
Parcel B.  That's the name we gave it in the litigation, but it was part of the pole barn and Nana's House architecture
topography."

[53] Deposition of non-party witness, Neal Conolly, dated February 16, 2015. FIGL Tr. Exs. K and L ("Conolly Tr."),
at 12-14; see also id., at 25.

Rehabilitator's proof of claim in the case.[54]  The Liquidator's current point person for FIC, Scott

D. Fischer, acknowledged that because he was not present during the Plan confirmation process,

as between the two of them, Mr. Conolly knew more about what FIC in rehabilitation knew and

intended during FIGI's bankruptcy.[55]  Mr. Conolly's testimony was submitted in the form of his

deposition transcript and thus the Court was unable to assess his credibility in person.  However,

no reason was given to question his motives or credibility, and the Court views him as an

unbiased and reliable third-party witness.

Mr. Conolly testified that he was aware while serving as FIC's administrator of the

documentation underlying the IDA tax abatement program as it pertained to the Rock Hill

Property and that the agreements "seemed to direct the reversionary interest to FIC."[56]

Nevertheless, he testified that "The IDA paperwork from my own reading was not consistent

with what I was given to understand,"[57] and as to the nature of that understanding Mr. Conolly

was unequivocal:  FIGI claimed a reversionary interest in Nana's House, the pole barn, the land

on which they sit and the adjacent parking lot, which the Rehabilitator did not dispute.[58]

Mr. Conolly testified that during the bankruptcy case, the Rehabilitator confirmed this

mutual understanding in two ways.  First, he testified that the Rehabilitator did not make any

claim to the pole barn, Nana's House and the land on which they sit, or the parking lot connected

to them, including in his proof of claim.[59]  Second, he testified that on behalf of the Rehabilitator

---

[54] Id., at 41.
[55] Trial Tr., at 28.
[56] Conolly Tr., at 90-92; see also id., at 20.
[57] Id., at 90
[58] Id., at 89-93, 98-100; see also id., at 34.  It is also worth noting that Mr. Conolly also thought of this real property not as Parcels B and C but as the buildings and the parking lot adjacent to them: Id., at 50; 99-100.
[59] Id., at 41-42, 44, 92-93 (Q.  "And when you filed the proof of claim did you intend to make any claim to that portion of the property, that is the Pole Barn, Nana's House, the adjacent parking lot and the land which it was on even though –" A.  "The answer to that is no. . . .")  Mr. Conolly also testified that he had no disagreement with anything on FIGI's original schedule of assets with the exception of the headquarters building.  Id., at 39-40.

and with the involvement of other officers of the Insurance Bureau, he negotiated a settlement

agreement with IMG to resolve the Rehabilitator's claims in the bankruptcy case that referred to

"the realty owned by FIGI."[60]  Elaborating on the meaning of this phrase, he testified that he

understood the "realty owned by FIGI" during the negotiations and in the Settlement Agreement

itself to mean "[t]he Pole Barn and Nana's House.  And the adjacent parking lot,"[61] and

confirmed his understanding at the time that the reversionary interest in these assets was to be

retained by FIGI and its successor under the Plan.[62]  The Liquidator correctly points out that the

Settlement Agreement by its own terms never became effective since one of its required

approvals -- by the state court supervising FIC's rehabilitation proceeding -- never occurred, and,

therefore, that FIGL cannot rely on it as a contract.  On the other hand, it was attached to the

Plan and clearly sets the context corroborating Mr. Conolly's testimony regarding the parties'

understanding of the nature of the reversionary interest in Parcels B and C.

The testimony of Al Escobar, Mr. Conolly's successor as chief executive officer of FIC

in rehabilitation, also corroborates Mr. Conolly's testimony that the Rehabilitator understood that

the reversionary interests in Parcels B and C would be retained under the Plan by FIGI/FIGL.

Mr. Escobar stated that the Liquidator's claim that "the southerly fifteen acres of the property in

Rock Hill, New York on which the Pole Barn equipment shed, Nana's House daycare center and

the adjacent parking lots are located (the 'FIGL Property') are and always have been property

beneficially owned by FIC," "is not supportable."[63]  He stated that he was advised after he

commenced work at FIC "by several individuals at FIC and the Bureau that the FIGL Property

was beneficially owned by FIGL," and continued that "[d]uring my employment with the

---

[60] Id., at 49-50, referring to FIGL's Trial Ex. H (the "Settlement Agreement").
[61] Conolly Tr., at 50.
[62] Id., at 98-100; see also id., at 37-38.
[63] Direct Testimony of Al Escobar, ¶ 2 [Dkt. 51].

Bureau, no one ever contradicted that understanding."[64]  On cross examination he credibly

reiterated that during his tenure at FIC he understood that "at the end of the IDA agreement the

properties would then revert back to the owners, which were FIC and FIGI," FIGI's properties

being "Nana's House, the pole barn and some of the parking lots heading towards the building,

the FIC building."[65]

Mr. Fischer, the Liquidator's current point person for FIC also testified that in 2005 the

Bureau was aware of FIGI or FIGL's claim to Parcels B and C, stating "I believe that there, at

the time, there was an oral tradition that suggested that there was some sort of split in ownership

of the 31 acres."[66]  When pressed, he acknowledged that the only people that he knew who

worked for the FIC or the Insurance Bureau during FIGI's bankruptcy, Ron Labenski and Chris

Dubois, took this view, as did Mr. Escobar.[67]

Although less significant than the testimony of FIC's own representatives, the testimony

of FIGI and FIGL/IMG's representatives during the bankruptcy case further corroborated the

parties' understanding when the Plan was confirmed that the reversionary interest in Parcels B

and C would belong to FIGL as FIGI's successor.  Suzanne Loughlin, FIGI's main representative

in the bankruptcy case stated, "At all times, based on my communications with representatives of

the Superintendent, it was understood by the Superintendent, FIGI and FIC in Rehabilitation that

the FIGI Property originally belonged to FIGI and would revert to FIGI.  Indeed, the first time I

learned that the Superintendent was claiming otherwise was in the fall of 2013, shortly before the

---

[64] Id., ¶ 6; see also id., at FN 1, referring to FIC's never-effectuated Rehabilitation Plan, which schedules only "the building" as an FIC asset and not Parcels B and C.
[65] Trial Tr., at 78-79.
[66] Designated deposition testimony of Scott D. Fisher, dated October 28, 2015. FIGL Ex. Q, at 88, 89, 111-112, 151-152.
[67] Id., at 146-149.  See also FIGL Ex. HH (internal Rehabilitator email dated July 20, 2005, involving three other Insurance Bureau employees, which assumes FIGI's ownership of Nana's House and the pole barn).

[IDA] program ended."[68]  Ms. Loughlin's testimony on this point, including on cross

examination, was consistent and credible, although she acknowledged the obvious, that the

actual, pre-bankruptcy IDA documents provided otherwise.

John A. Petrilli, IMG/FIGL's representative during the bankruptcy case agreed with Ms.

Loughlin and Mr. Conolly's understandings about the reversionary interest in Parcels B and C,

including as to the meaning of the reference in the Settlement Agreement to "realty owned by

FIGI" that he and Mr. Conolly, among others, negotiated.[69]  His testimony, including on cross

examination was also consistent and credible.[70]

Under the circumstances, therefore, it is clear that the Rehabilitator understood that the

"Assets" that were transferred to FIGL under the Plan and for purposes of the Confirmation

Order included not only the reversionary interest in Parcel C but also in Parcel B.  To rule

otherwise based on judicial estoppel or any other equitable doctrine would provide the

Liquidator, as the Rehabilitator's successor, with an improper windfall contrary to 11 U.S.C. §

1141(a)-(c) and undo the Plan and Confirmation Order.

## Conclusion

For the foregoing reasons, under the Plan the reversionary interests in Parcels B and C are

property of FIGL, and the Liquidator is precluded by the Plan and the Confirmation Order from

interfering with those interests.  Accordingly, the IDA is required to promptly transfer title to

Parcels B and C to FIGL.  Counsel for FIGL shall email a proposed judgment consistent with

---

[68] Direct Testimony of Suzanne Loughlin, ¶ 5 [Dkt. 49].  Ms. Loughlin had previously defined the "FIGI Property"
as "Nana's House, the Pole Barn, the contiguous parking lots and the land they were on."  Id., ¶ 3; see also id., ¶ 10,
noting the Settlement Agreement's reference to "the realty owned by FIGI."
[69] Direct Testimony of John A. Petrilli, ¶¶ 9-11, 22-26; see also id., ¶ 46:  "[I]t was Mr. Conolly who advised me
that there were errors in the CSIDA documentation.  Nevertheless, on FIC's behalf, Mr. Conolly filed a Proof of
Claim that knowingly and intentionally omitted any claim against what is now referred to as Parcels B and C."
[70] Trial Tr. at 132-134.

this Memorandum of Decision to chambers, copying counsel for the Liquidator and counsel for

the IDA.

Dated:  White Plains, New York
        February 15, 2018

                                    /s/Robert D. Drain_____
                                    United States Bankruptcy Judge